IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF TROY CAUSEY, JR., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:15-CV-00914-N |
| MIKE MILES, *et al.*, | § § § | |
| Defendants. | § § | |

### ORDER

This Order addresses Defendant Terry Smith's motion to dismiss [17] and Defendant Mike Miles's motion to dismiss [19]. Because neither the Department nor Dallas ISD had a constitutional duty to protect Causey from private harm, the Court grants both motions.

### I. THE BASIS OF THE ESTATE'S COMPLAINT

Plaintiff Estate of Troy Causey, Jr. (the "Estate") brings this action under 42 U.S.C. § 1983 against Smith in her official capacity as Executive Director of the Dallas County Juvenile Department and Chief Juvenile Probation Officer for Dallas County (collectively, the "Department") and against Miles in his official capacity as Superintendent of the Dallas Independent School District ("Dallas ISD"). The Estate alleges that the Department and Dallas ISD violated Causey's constitutional rights under the due process clause of the Fourteenth Amendment by causing his death at the hands of a third party, Johnathan Turner.

#### *A. The Events Leading to Causey's Death*

The Estate relates the following chain of events in its First Amended Complaint [14].

ORDER – PAGE 1

In 2013, the Department obtained custody of Causey and placed him at the Dallas County Youth Village ("Youth Village"), a residential placement facility for juvenile offenders. During his placement at Youth Village, Dallas ISD personnel visited Causey and recruited him to play basketball at Wilmer-Hutchins High School. The head basketball coach for Wilmer-Hutchins High School, John Burley, was among the staff members who visited and recruited Causey. The Estate alleges that Burley and other Dallas ISD personnel had "unadulterated and unsupervised access" to Causey and his juvenile records during this period. Pl.'s First Am. Compl. ¶ 29 [14].

After recruiting Causey, Burley and Dallas ISD "set up a residence" within Dallas ISD's attendance zone and "caused Causey to be registered" to attend Wilmer-Hutchins High School. *Id.* ¶ 32. Burley and Dallas ISD allegedly took these steps so that Causey, a resident of Richardson Independent School District, could play sports at Wilmer-Hutchins High School upon his release from Youth Village. The Estate alleges that Causey's paperwork at Dallas ISD "was falsified to allow the transfer and was made without parental approval." *Id.* ¶ 36.

Causey's placement at Youth Village ended in April, 2013. After his release, Causey went to live at the Dallas ISD residence that Burley had set up. Dallas ISD arranged for another young man, Turner, to live in the same home. Like Causey, Dallas ISD recruited Turner to play basketball at another Dallas ISD school, Madison High School. Turner was allegedly in the Department's custody at the time of his recruitment. According to the Estate, Causey and Turner lacked "adequate supervision" at the home. *Id.* ¶ 42.

On March 23, 2014, a fight erupted between Causey and Turner. Turner forced Causey to the ground and beat Causey about the head, crushing his skull. Causey suffered severe brain damage as a result of the attack. He died of his injuries the following day.

### B. Investigations Concerning Dallas ISD's Recruitment of Student Athletes

According to the Estate, Dallas ISD has a longstanding practice of recruiting student athletes to play for schools in its district. "In 2012, a [Dallas ISD] investigation found a 'concerted attempt' by coaches and administrators to recruit players from both within and without [Dallas ISD] without regard to the schools to which those students were properly zoned." *Id.* ¶ 12. The result was "a policy and practice where anomalies and clear deviations on [University Interscholastic League ("UIL")] and other rules and regulations were routinely disregarded." *Id.* ¶ 14. Such rules and regulations included Dallas ISD's own policies and procedures, which are supposed "to prevent recruiting and the placement of students like Causey into dangerous conditions." *Id.* ¶ 15.

The Estate alleges that Dallas ISD's Board of Trustees (the "Board") charged the Dallas ISD Enforcement Committee (the "DEC") with the implementation of its policies on recruitment.[1] The DEC, "as a matter of course," approved the athletic eligibility of students who had transferred between schools. *Id.* ¶ 14. Dallas ISD's Athletic Compliance Director,

---

[1]In his motion to dismiss, Miles contends that the DEC to which the Estate refers is actually the District Executive Committee, a UIL committee composed of representatives from each school within a UIL district. *See* Def.'s Br. in Supp. 20 n.101 [19]. For purposes of a motion to dismiss, however, the Court must assume that all well-pleaded facts in the complaint are true. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).

Anita Connally, found that DEC members made inconsistent voting decisions regarding student eligibility matters:

> [C]oaches do not vote against a [Previous Athletic Participation Form ("PAPF")] because the coaches voting on the issues could sometime in the future get a PAPF with similar and/or questionable eligibility issues at their campus that the coaches would have to present to the DEC for approval. In that situation, the coach presenting the PAPF would expect a favorable vote on their own questionable student eligibility issues because that coach had previously voted favorably on eligibility issues for another coach.

*Id.* Ex. A. During one DEC meeting, Connally voiced her concerns about the authenticity of a certain student's PAPF. The Committee members voted to approve the student's athletic eligibility over Connally's objections. Connally believed that the DEC members were "unable to police themselves," and that Dallas ISD should establish an independent compliance officer or department to rule on student eligibility matters. *Id.*

After Causey's death, Connally and Jeremy Liebbe, a Dallas ISD investigator, began a fresh investigation into Causey's transfer and athletic eligibility. In his report, Liebbe concluded that multiple Dallas ISD employees had forged Causey and Turner's home visitation documents. Dallas ISD subsequently fired both employees in response. According to the Estate, Dallas ISD fired Connally in particular because she attempted to make Dallas ISD's recruiting practices publicly known.

## II. THE RULE 12(B)(6) STANDARD

When considering a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, a court may also consider documents outside of the pleadings if they fall within certain limited categories. First, "[a] court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, "[a] written document that is attached to a complaint as an exhibit is considered part of the complaint and

may be considered in a 12(b)(6) dismissal proceeding." *Ferrer*, 484 F.3d at 780. Third, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Finally, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citation omitted); *see also, e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "[t]he district court took appropriate judicial notice of publically available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand").

### III. THE ESTATE FAILS TO STATE CLAIMS FOR *MONELL* LIABILITY

Smith and Miles have each moved to dismiss the Estate's complaint for failure to state a claim. The Estate opposes the motions, arguing that the complaint successfully states claims under 42 U.S.C. § 1983 against both Smith and Miles. In the alternative, the Estate argues that the Court should permit the Estate leave to amend its complaint after a period of discovery into the Department and Dallas ISD's policies and practices. Because neither entity had a constitutional duty to protect Causey, however, the Estate's claims fail as a matter of law. Accordingly, the Court grants both motions to dismiss with prejudice and denies the Estate's request for discovery.

### A. The Court Treats the Estate's Claims as Claims for *Monell* Liability Against the Department and Dallas ISD

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quotation marks and citation omitted)). Because the Estate sues Smith and Miles in their official capacities, the Court treats the Estate's claims as against the Department and Dallas ISD, respectively. *See, e.g.*, *McKay v. Dallas Indep. Sch. Dist.*, 2007 WL 2668007, at *5 (N.D. Tex. 2007) (Lindsay, J.) (treating lawsuit against Dallas ISD superintendent in his official capacity as lawsuit against Dallas ISD).

"Under § 1983, a municipality or local governmental entity such as an independent school district may be held liable only for acts for which it is actually responsible." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 691 (1978). Rather, to establish the Department and Dallas ISD's liability, the Estate must identify "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also Monell*, 436 U.S. at 694. For purposes of *Monell* liability, an official policy may consist of,

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy,

> is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004). *Monell* liability will attach only if the alleged policy is facially unconstitutional or if the municipality "promulgated [the policy] with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)).

### B. Neither the Department nor Dallas ISD Had a Constitutional Duty to Protect Causey

The Estate maintains that the Department and Dallas ISD violated Causey's constitutional right to due process of law under the Fourteenth Amendment by failing to protect him from Turner's assault. However, the Estate cannot demonstrate a violation of Causey's constitutional rights because neither the Department nor Dallas ISD had a constitutional duty to protect him from private violence. The due process clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the

Due Process Clause." *Id.* at 197.  And where there is no violation of the constitution or federal law, there can be no section 1983 liability.  *See Leffal v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994) ("To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.").

The Fifth Circuit has recognized one exception to this general rule of nonliability – namely, that a governmental entity may create a special relationship with a citizen that requires the entity to protect the citizen from private harm.  *See Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 855–56 (5th Cir. 2012).  This exception only applies where the entity "'takes a person into its custody and holds him there against his will.'"  *Id.* (quoting *DeShaney*, 489 U.S. at 199–200).  The Fifth Circuit has identified three groups of individuals who have a special relationship with the government: prisoners, persons involuntarily committed to mental institutions, and children in foster care.  *Id.* at 856.[2]

Causey did not belong to any of these three groups at the time of his death.  While the Department may have had a special relationship with Causey as a result of his incarceration

---

[2]In Order, September 9, 2014 [158], *in Onie Jane Pena v. Dallas County Hospital District, et al.*, Civil Action No. 3:12-CV-439-N (N.D. Tex. removed February 10, 2012), this Court held that state-employed medical personnel had a special relationship with a mental patient who had been restrained in the hospital involuntarily and against his will.  *See id.* 17–20.  As discussed below, however, neither the Department nor Dallas ISD restrained Causey in this manner.

at Youth Village, that special relationship ended after his release from custody.  As for Dallas ISD, the Fifth Circuit has repeatedly held that public schools do not have a constitutional duty to protect their students from private violence.  *See Covington Cty.*, 675 F.3d at 858.  Thus, Dallas ISD did not have a special relationship with Causey purely by virtue of his enrollment at Wilmer-Hutchins High School.

The Estate argues that Dallas ISD nonetheless had a special relationship with Causey because he was in a "de-facto foster care relationship."  Pl.'s First Am. Compl. ¶ 47 [14].  But to create a special relationship with a citizen, a governmental entity must, "through an established set of laws and procedures, render[] the person in its care completely unable to provide for his or her basic needs and . . . assume[] a duty to provide for these needs."  *Covington Cty.*, 675 F.3d at 859.  The allegations in the complaint do not meet this threshold.  Although the allegations show that Dallas ISD heavily recruited Causey, they do not demonstrate that Dallas ISD forced Causey to attend Wilmer-Hutchins High School or to live in the residence with Turner.  Rather, once Causey left the Department's custody, his parents assumed the legal responsibility of providing him with food, clothing, shelter, medical care, and reasonable safety.  *Id.* at 860.  Accordingly, neither the Department nor Dallas ISD had a special relationship with Causey requiring them to protect him from private violence.  *See Walton v. Alexander*, 44 F.3d 1297, 1304–05 (5th Cir. 1995) (finding no special relationship where resident student of state school for the deaf had the option to leave at will); *J.D. v. Picayune Sch. Dist.*, 2013 WL 2145734, at *5–6 (S.D. Miss. 2013) (finding school had no

special relationship with student athlete who was free to quit baseball team or attend different school).

Alternatively, the Estate maintains that the Department and Dallas ISD had a constitutional duty to protect Causey because their policies placed Causey in harm's way. The Fifth Circuit has not yet adopted the state-created danger exception, but it has outlined the contours of such a claim. *See Covington Cty.*, 675 F.3d at 864–65. In order to plead *Monell* liability under the state-created danger exception, the Estate must allege that "(1) the defendants used their authority to create a dangerous environment for the plaintiff and (2) that the defendants acted with deliberate indifference to the plight of the plaintiff." *Id.* at 865. The Fifth Circuit has further held that "the state-created danger theory requires a *known victim*, and the fact that a school's policy or procedure presents a risk of harm to students in general is inadequate to satisfy this requirement." *Dixon v. Alcorn Cty. Sch. Dist.*, 2012 WL 6019053, at *3 (5th Cir. 2012). Causey was not a known victim for purposes of the state-created danger exception because he was one of many students who allegedly faced a risk of harm due to the Department and Dallas ISD's policies. Accordingly, even if the Fifth Circuit were to adopt the state-created danger exception, the Estate's allegations would not meet its requirements.

Finally, the Estate contends that it has alleged a constitutional violation because the Department and Dallas ISD's conduct shocks the conscience. However, the shocks the conscience standard is not a separate exception to the *DeShaney* principle. *See Covington Cty.*, 675 F.3d at 868. "To allow [the Estate] to proceed on a shocks the conscience theory

without first demonstrating a constitutional duty to protect would be wholly inconsistent with *DeShaney*." *Id.* at 869.

Neither the Department nor Dallas ISD had a constitutional duty to protect Causey from private violence. As a result, neither entity violated Causey's constitutional rights when they failed to protect him from Turner's assault. The Estate has not explained how it can correct this deficiency through further amendment of the pleadings. Because the Estate's section 1983 claims against the Department and Dallas ISD fail as a matter of law, the Court denies the Estate's request for leave to amend and dismisses the Estate's complaint with prejudice.

### C. None of the Alleged Dallas ISD Practices Support a Claim for **Monell** Liability

Even if the Estate could establish a violation of Causey's constitutional rights, the Estate's allegations against Dallas ISD nonetheless fail to state a claim for *Monell* liability. The Estate presents two theories of liability against Dallas ISD. First, the Estate alleges that Dallas ISD's practices concerning the recruitment of student athletes led to Causey's death. Second, the Estate contends that Dallas ISD should be liable for its failure to train or supervise its employees. The Court concludes that the Estate's allegations do not support a claim for *Monell* liability under either of these theories.

***1. The Estate Does Not Identify Any Official Dallas ISD Policy or Custom That Was the Moving Force Behind Causey's Death.*** – The Estate's First Amended Complaint lists the following Dallas ISD practices that allegedly resulted in Causey's death:

 (1) The practice among Dallas ISD employees of recruiting student athletes while in the Department's custody;

 (2) The practice among Dallas ISD employees of placing student athletes who had been recruited from the Department's custody in unsupervised homes with other, dangerous recruits; and

 (3) The general practice among Dallas ISD employees of recruiting student athletes to play for Dallas ISD schools.

None of these alleged practices supports a claim for *Monell* liability under section 1983.

The Estate first alleges that Dallas ISD has a "long-time practice . . . [of] allow[ing] [Dallas ISD] personnel to visit with otherwise incarcerated youth for the purpose of sports recruiting." Pl.'s First Am. Compl. ¶ 26 [14]. But the Estate points to only two student athletes, Causey and Turner, who were in the Department's custody at the time of their recruitment. And while the facts surrounding Causey's recruitment are relatively well-developed, the Estate alleges almost no details regarding the recruitment of Turner. Even if the Court accepts the Estate's position that Dallas ISD recruited both young men while they were in the custody of the Department, "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Piotrowski*, 237 F.3d at 581 (internal quotation marks and citation omitted).

In addition, the Estate has not alleged that Dallas ISD had actual or constructive knowledge of this particular recruiting practice. "Actual or constructive knowledge of [the alleged] custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Johnson*, 379 F.3d at

ORDER – PAGE 13

309.  Here, the relevant policymaker for purposes of *Monell* liability is the Board.  *See* Tex. Educ. Code § 11.151(b) (providing that an independent school district's board of trustees has "the exclusive power and duty to govern and oversee the management of the public schools of the district"); *Rivera*, 349 F.3d at 247 (holding that state law determines whether a policymaker has final policymaking authority).  Yet the only people who allegedly knew about the circumstances of Causey and Turner's recruitment were Burley and other unspecified staff members who visited the young men while they were in the Department's custody.

These facts are insufficient to establish that Dallas ISD had an official policy of recruiting student athletes from the Department's custody.  To attribute Burley's knowledge to the Board on these alleged facts would be dangerously close to holding Dallas ISD vicariously liable for the actions of a rogue employee or two – a result that courts have repeatedly cautioned against.  *See Rivera*, 349 F.3d at 247 ("Municipal liability cannot be sustained under a theory of *respondeat superior*."); *see also Monell*, 436 U.S. at 691.  Accordingly, to the extent the Estate's allegations relate to a practice among Dallas ISD employees of recruiting student athletes while they are in the Department's custody, this theory of *Monell* liability fails.

The second alleged practice concerns Dallas ISD's placement of "young and immature students, with (albeit juvenile) violent backgrounds[,] into inadequately supervised housing," solely for the purpose of ensuring their athletic eligibility.  Pl.'s First Am. Comp. ¶ 46 [14].  The Estate never specifies who placed Causey and Turner at the Dallas ISD residence, or

whether their parents or guardians consented to the living arrangement. *See id.* ¶ 34 ("Both Causey and Turner were placed in the same residence . . . ."); *id.* ¶ 40 ("Causey was placed in the home with Turner."); *id.* ¶ 42 (alleging Turner and Causey "had been placed" in the home). The Estate also fails to specify whether either young man had a history of violence. Thus, the Estate's allegation that Dallas ISD has a custom of placing dangerous recruits in unsupervised housing is speculative at best. Because "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555 (internal citations omitted), this theory of liability fails as well.

Dallas ISD's third practice, according to the Estate, entails the recruitment of student athletes to play for Dallas ISD schools. The Estate's descriptions of the DEC's voting practices and the results of Connally and Liebbe's internal investigations render this third alleged practice slightly more plausible. The Court is also willing to entertain the notion that the Board had constructive knowledge of the recruiting practice,[3] as at least one internal investigation dating back to 2012 allegedly uncovered its existence. Thus, at the motion to dismiss stage, Dallas ISD's practice of recruiting student athletes could constitute an official policy.

---

[3]The Estate also argues that Dallas ISD had actual knowledge of its employees' recruiting practices because the Board delegated its final policymaking authority to the DEC, which witnessed the recruiting practices first hand. However, the Estate cites no law, edict, or other official document that either authorizes or effectuates the Board's delegation of authority to the DEC. "A federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Rivera*, 349 F.3d at 248 (internal quotation marks and citation omitted). Accordingly, the allegations do not support the inference of actual knowledge on the part of Dallas ISD.

Nevertheless, *Monell* liability for this policy cannot attach. In order for an official policy to be the "moving force" behind a constitutional violation, there must be "'a direct causal link between the municipal action and the deprivation of federal rights.'" *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of Comm'rs*, 520 U.S. at 404). The Estate's allegations do not show that Dallas ISD's general policy of recruiting student athletes to play for Dallas ISD schools directly caused Causey and Turner to reside together in the same home, to live with inadequate supervision, or to fight and argue. In addition, the Estate has not alleged that Dallas ISD knew its recruiting policy would endanger the life of any student athlete; hence, the allegations fail to show that Dallas ISD acted with deliberate indifference to Causey's rights. *See McClendon v. City of Columbia*, 305 F.3d 314, 326 n.8 (5th Cir. 2002) ("To act with deliberate indifference, a state actor must known of and disregard an excessive risk to the victim's health or safety." (quotation marks and citations omitted)). Because the Estate fails to show causation and deliberate indifference, this third alleged practice does not support a claim for *Monell* liability.

***2. The Estate Fails to State a Claim Against Dallas ISD for Failure to Train or Supervise.*** – The Estate names one additional practice which allegedly resulted in Causey's death: Dallas ISD's failure to train or supervise its employees. To plead a section 1983 claim for failure to train or supervise, the Estate must allege that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis ex rel. McCully v. City of*

*North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359 (2011). Here, the Estate alleges that "[t]here was a complete lack of training as to policy and a complete lack of enforcement and oversight" at Dallas ISD, presumably because employees failed to follow the district's written policies prohibiting the recruitment of student athletes. Pl.'s First Am. Compl. ¶ 37 [14]. However, the Estate has pled no additional facts – such as a particular deficiency in Dallas ISD's training programs or supervision – with respect to this claim. Moreover, the Estate offers no reason to assume that the employees' failure to follow Dallas ISD's policies on athletic eligibility and recruitment was the result of any failure to train or supervise. The Estate's conclusory assertions do not survive the motion to dismiss. *See Ferrer*, 484 F.3d at 780 (holding that a court should not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions").

The Estate contends that the Court should not dismiss its section 1983 claim against Dallas ISD until it has had an opportunity to conduct discovery on Dallas ISD's policies and practices regarding training and supervision. Yet a failure to train or supervise will not render a governmental entity liable for the actions of a third party absent a special relationship between the victim and the entity. *See Teague ex rel. C.R.T. v. Texas City Indep. Sch. Dist.*, 386 F. Supp. 2d 893, 895 (S.D. Tex. 2005), *aff'd* 185 Fed. Appx. 355 (5th Cir. 2006). Because there was no special relationship between Dallas ISD and Causey, discovery will not cure the Estate's claim.

### D. None of the Alleged Department Customs Can Support a Claim for *Monell* Liability

As with the Estate's claims against Dallas ISD, the lack of any constitutional violation in this case is fatal to the Estate's section 1983 claim against the Department. Even if the Estate could establish a constitutional violation, though, the Court still concludes that its allegations fail to state a claim for *Monell* liability against the Department.

***1. The Estate Does Not Identify Any Official Department Policy or Custom That Was the Moving Force Behind Causey's Death.*** – In its First Amended Complaint, the Estate sets forth two Department practices that allegedly resulted in Causey's death:

(1) The Department's custom of allowing Dallas ISD personnel to recruit young men and women while under the Department's custody; and

(2) The Department's custom of placing these recruits in unsupervised homes with other recruits.

The Estate's allegations regarding the Department suffer from many of the same deficiencies affecting its allegations against Dallas ISD. First, the Estate points to only two student athletes, Causey and Turner, who were in the Department's custody at the time of their recruitment. Second, the Estate never specifies who placed Causey and Turner at the Dallas ISD residence, whether their parents or guardians consented to the living arrangement, or whether either young man had a history of violence. Accordingly, neither of these practices could be fairly considered "so common and well settled as to constitute a custom that fairly represents municipal policy." *Johnson*, 379 F.3d at 293.

*2. The Estate Fails to State a Claim Against the Department for Failure to Train or Supervise.* – The Estate also alleges that the Department violated Causey's constitutional rights through its failure to train or supervise its employees. The Estate bases this allegation on the Department employees' failure to follow the Department's own written policies regarding access to Youth Village residents and their records when they permitted Burley to recruit Causey. However, the Estate does not identify any particular inadequacy in the Department's training or supervision that the Department needs to remedy. Nor does the Estate offer any reason to assume that this alleged breach in protocol was a result of the Department's failure to train or supervise its employees. Because the Court does not accept conclusory allegations as true, *see Ferrer*, 484 F.3d at 780, the Estate's assertions do not survive the motion to dismiss.

The Estate contends that the Court should deny Smith's motion to dismiss because the complaint shows "the need for discovery on its face." Pl.'s Br. in Resp. 4 [15]. However, even if the Estate could provide more specific allegations regarding the asserted practices, discovery would not cure the Estate's failure to allege a violation of Causey's constitutional rights. *See Leffal*, 28 F.3d at 525. Because the Department did not have a constitutional duty to protect Causey from private harm, the Estate's section 1983 claim fails as a matter of law. As a result, discovery in this case would be futile.

## CONCLUSION

Because neither the Department nor Dallas ISD had a constitutional duty to protect Causey from private harm, the Estate's claims fail as a matter of law. Further discovery and

ORDER – PAGE 19

amendment will not correct this deficiency. Accordingly, the Court denies the Estate's request for leave to amend and dismisses the Estate's complaint with prejudice.

Signed November 19, 2015.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 20